I'm sorry. Well, you'll correct me when you get up there. Sorry. May it please the Court, Your Honors. Good morning. My name is Jeffrey Abraham. I am counsel for Plaintiff's Appellant's Glazer Capital Management and Glazer Offshore Fund. They are the institutional investors who are appointed as lead plaintiffs in the class action filing of the Securities and Exchange Act. I'd like, if possible, to reserve three minutes for rebuttal. The pending appeal before the Court involves two orders of the district court. The first was the dismissal of a second amended complaint, and the second was denying plaintiffs leave to file a third amended complaint, which plaintiffs believed had corrected or addressed certain pleading deficiencies previously identified by the district court in oral argument. The standard for each of these cases before this Court right now is a de novo review, with particular emphasis in this Court on leave to replete, that denial for leave to replete should never happen if the case can somehow be saved by some sort of amendment. The underlying claims in the action, Your Honors, relate to the announcement of a merger transaction in which a company called InVision, which is a defendant in this case, was to be acquired by General Electric for $50 a share. Am I correct, the merger went through? The merger ultimately went through. However, the merger, Your Honor, did not go through on the timetable that it was originally scheduled, and there was a big bump in the road, and there was a big change in the perception of the risk that the merger would, in fact, not proceed. And the precipitating fact that changed the public investor's perception of risk was the announcement that the company had, in fact, entered into a consent decree with respect to Foreign Corrupt Practices Act violations. The underlying violations, which are essentially bribes made overseas to sell rather large machines, You know, it bothers me, and maybe you might get to this right away. This is not what we usually have. One of these press releases or something that people glom on to and say, this is something obviously the investors are going to pay attention to. Here we have a 60-page merger agreement in which it specifically says that no one gets any rights or benefits except these mergered people. So the document is not one of the usual ones. It's just a merger agreement. And in there is some information that you just quoted. Certainly, Your Honor. The question is, would a rational investor reading that and saying there's no rights or anything towards anybody except the merging parties, would a rational investor, say, put any stock into it? I think the answer is absolutely yes. Why is that? I'm having a problem. Well, I'll tell you, in particular circumstances, my clients are risk arbitrageurs. And they read these documents very carefully. And what the document is saying when the merger agreement is announced is that we're expecting to be acquired by General Electric. These are the terms of our agreement. We are in compliance with all the terms. But even if there was not a specific merger agreement attached, the mere statement that we are going to be acquired by General Electric for $50 a share would be rendered materially misleading by not saying we have this major legal issue out there that might impair the potential merger from going through. And beyond that, Your Honor, there's also the issue of Section 29A of the Exchange Act. And you're not allowed to opt out of disclosure. You're not allowed to contract out of disclosing things to the public. The merger agreement was disclosed. It's expected that investors will read it. It's expected that investors will gain an understanding of the risks of whether the merger would close. And it closed timely. And, in fact, the merger did go through. Well, it closed, but there was a significant bump in the road. I wasn't clear on something. Why does that matter? Why does what matter, Your Honor? That there's a bump in the road. Well, Your Honor, it matters for the following reason. When an announcement is made, let's say there's going to be a transaction for $10 or $100. Investors try to assess the risk of whether that merger will go through or won't go through as announced. And there is an active market in the securities market, which is important not just to arbitrageurs, but to long-term investors as well in being able to cash out of the stock when the merger is announced. And arbitrageurs and other investors price the stock based upon the perceived risk that the merger will go forward and that it will go forward on the timing announced. Now, if a merger --. Well, there's inevitably a risk, correct, in all of those situations in which a merger is announced and has not yet been completed. There's always some amount of risk, right? Absolutely, Your Honor. But the question is, was the risk really disclosed? And here the risk, the relevant risk of the Foreign Corrupt Practices Act violations, the foreign bribery, wasn't disclosed. It was obfuscated. To the contrary, to the extent one read the public filings made with the Securities and Exchange Commission, there was every indication that there were no such problems. So -- Do you come to the conclusion the problems are not material to the merging people because the merger went through? Well, setting aside the fact that materiality is a mixed question of fact and law that's ultimately usually decided at summary judgment or a trial, here there's substantial evidence it was material because GE put the merger on hold. And there was a real question for a period of time whether the merger would proceed and if so, on what terms. Ultimately, everything months later worked out well. But at the time it occurred, it was a material fact. And it would have been a material fact if at the time the merger was announced, Envision had said, we have this merger agreement, but, you know, we have some legal problems because we've been bribing people overseas and it's a Foreign Corrupt Practices Act violation and General Electric might not want to buy us until it's fully resolved with the Department of Justice and the SEC. Let me ask you this, which I was unclear on. You indicated that when the announcement came out about the Foreign Corrupt Practices Act, which the company says it was the one that took the lead in reporting, what ultimately, there was a drop in the stock, as would be expected. What ultimately happened to the stock once the merger went through and it was announced there had been a resolution of the issue with Justice? What ultimately happened? The stock came back. But the issue in the securities market is that people buy and sell. We're dealing with active securities markets. This is not, this is a purchaser-seller claim. This is not a holder claim. If I was bringing a claim on behalf of people who held the stock, there would be no damages. And I'm still a little bit confused. The stock came back. What are the allegations in your, any of the, what is it, foreign health complaints or whatever the number is, that the named defendants certainly, which is required under the increased duties and pleading, knew about this, were involved, were hiding it, were doing anything in terms of the allegations in any basis for them? Well, Your Honor, the proposed Third Amendment complaint involves a Senior Vice President of Marketing who is a member of the Board of Directors, receiving e-mails and by directing communications as to how to engage in these bribery transactions and how to get compensation from them out of selling general administrative expenses. So a very senior executive. The reality, which you're arguing here, is not for the second amended complaint. You're arguing for the third. Well, I. The denial of your right to amend. Well, that's part of it, Your Honor. I would argue also that the nature of the fraud here is such, and the nature of the magistrate's and Mulholland's position in the company is such, that they, there's a fair interest to be gained that they knew it. And in that context, Your Honor, I sent a letter to the Ninth Circuit on Wednesday by FedEx. We have that. Concerning the recent decision in the Applied Signal Technologies. We have that in front of us. And I think that and other cases cited in our brief, such as America West, suggest that where there's something of this nature, and you have even in a press release during the class period, Mr. Magistrate or Mr. Mulholland, I forget right now, mentions one of the specific contracts, which turns out was the subject of a bribe. Well, let me look at Burson for a minute, which focuses on the notion of the backlog and how it was treated, was known virtually by everybody in the company. And so the question was whether it's, the reference to it in a, was, had to have been known here. The defendant said nothing was shown to show that, was it, Magistrate, how do you pronounce it? Magistrate. Magistrate or anybody else knew about these other agents who were, may or may not have been engaging in this activity. Well, Your Honor, there's a concentrated nature of the business here. There's a relatively limited number of these big machines that are sold. One of the specific sales is mentioned in a press release of the company. There's Sarbanes-Oxley certifications and legal requirements, Congress instituted in 2002, that prevent, are supposed to prevent senior executives of the company, specifically the CEO and CFO, from taking the position that we didn't know we had our head buried in the sand. It's supposed to require people to take responsibility. And they signed the certification saying we have instituted an adequate system of internal control. The Foreign Corrupt Practices Act consent decree says the company was aware. The company was aware, okay, I mean, I guess that doesn't directly answer the question of whether Mr. Magistrate or Mr. Mulholland, but the concentrated nature of the business is Sarbanes-Oxley certification and the mixed fact in this case of the desire to profit by going through with the transaction. This was not an insignificant event in Mr. Magistrate's or Mr. Mulholland's life. Going through with the merger was going to enrich them significantly through accelerating options and enabling them to cash out in a good way on their investment, getting liquid. And I think that under, I didn't send in a copy of the Tellab's decision because I assume that the Court is familiar with it. I think that on the Tellab's standard, we don't have to have a smoking gun. We have to have a cogent explanation which is at least as likely as opposed to more likely than not, which was the dissent's view. But it's as least as likely as an alternative explanation. And I think that we have that here, Your Honors. I think we have a statement or statements that were materially misleading, and we have alleged C. Enter, either through the third amended complaint with respect to Mr. Pillar and Envision, or even in the second amended complaint with respect to Mr. Magistrate, Mr. Mulholland and the company. I think we've properly alleged that here, and I think this is a case that should go forward because there are real damages for the people who purchased and sold, which is how the securities markets in this country are set up, and we're trying to provide liquidity to investors. To not do so would be problematic. It sounds like what you're saying, and what I kind of gleaned from the brief, was under the PSLRA, you're trying to say that you can just allege, well, they must have known sort of as a general proposition. This is not going to your proposed third amended consolidated complaint. But on the second, isn't that what you're really saying? I'm not sure that's appropriate. Well, I'm saying it's a little bit more than just a plain must have known. I'm saying the context of this case, because of the concentrated nature of the The units are big machines. Some quarters they only sell eight of them or even less. Because it was specifically mentioned in one of the press releases. What was it? Three potential sales. One in the Philippines, and I've forgotten the other two. China and Thailand. Right. Thank you. That, you know, based on that, I realize it's a concentrated sales, but to say that that means that these specific defendants would know, isn't that sort of You're trying to do an end around the pleading requirements? Your Honor, I really don't think we're trying to do an end around the pleading requirements. You have the consent decree. You have Sarbanes-Oxley certifications in which these particular defendants say we've established a system of internal control sufficient to identify these things. This is still, you know, it's a pleading motion. We haven't had any opportunity for discovery. It's at least as reasonable an inference as an opposing inference, which defendants the court and did convince the district court to buy into. I'd like to reserve some time for rebuttal, Your Honor. You may do so. Thank you, Your Honor. I thought you might want to say something. Sorry? I thought you might want to say something. Good morning. May it please the Court. I'm Susan Muck, here on behalf of the Defendants and Vision Company, Sergio Magistri, and Ross Mulholland. Plaintiffs are arguing this case as if it were a case under notice pleading standards. And, indeed, it is not a case in which notice pleading standards apply. It's a case in which the Private Securities Litigation Reform Act standards apply. Those standards are unique, and they require particularized pleading of a statement and a cogent and compelling inference of fraud. Let me ask you about the misstatement first. You know, the average person on the street might not read this merger agreement, but it was attached, and it does contain misstatements, or at least that's a pretty permissible inference, that there are misstatements concerning compliance at pages 13 and 14 of the agreement. And I don't understand why any attachment or any statement can't be a misstatement for this purpose, that it doesn't have to be a press release, it doesn't have to be in any particular form. Or at least I'm not aware of any case that says that only certain forms are okay. Your Honor, in this instance, the merger agreement was a contract between General Electric and Envision and contained bargain for representations and warranties by those two entities. Wait, wait, wait. Bargain for, how do you bargain for a statement that the company is in compliance with the law and has made no improper payments? That's not bargain for the way a price is bargained for. It's either true or false, right? Well, in this particular merger agreement, the parties actually referred to a document that was not part of the merger agreement. You're not answering my question. My question is, there are some aspects of an agreement that clearly are bargained for, but when a party makes a representation in an agreement, I am in compliance with laws A, B, and C, and I have made no improper payments. Presumably you can't bargain for that if it's false. So, I mean, why isn't that a representation that's contained within a bargain for arrangement? In this instance, this was a representation by Envision to General Electric, and the document was attached to what became a public filing in the 10-K, but the GE merger agreement, we believe, is not a representation under the securities laws. But if it goes out as a 10-K, this isn't a breach of contract action, allegedly. It goes out on the 10-K, you're saying, well, we expect the public, and especially the sophisticated arbitragers, et cetera, well, they'll read what's in the 10-K, but they'll understand, you know, we've attached this merger, it's public, but nobody's going to rely on any of the representations there. Does that make any sense to you? We believe that not all public documents are representations to shareholders. Well, what I'm saying is if you've got a sophisticated investor who says, look, I'm looking at the possibility of a merger here. I know there's a possibility of a merger. I'm going to scrutinize this merger agreement, and that may help me define how I price the stock, what I'm willing to do here. Ah, I see in the merger agreement it says you're in complete compliance. And you've signed it. There's a Sorbanes-Oxley signed off, which was later found not to be true in terms of controls, or at least suggested. Isn't it reasonable that one of the ñ a sophisticated investor or any investor would rely on that information? It's put out. A sophisticated investor reading this merger agreement would see that it's not an unconditional guarantee of compliance with all laws. It's based on the knowledge of the individual signing the agreement. In this instance, Dr. Magistri, as to whom there are no facts anywhere in the record of any knowledge by him that the company or any employee or officer of the company had violated the law. He signed the Sorbanes-Oxley? He signed the Sorbanes-Oxley certification. Wasn't that a representation that there were adequate controls, which it turns out ñ and then the company comes out and announces, oh, by the way, we have figured out we have a Foreign Corrupt Practices Act problem. Hey, well, we're going to take care of that, and don't worry about it. It's not going to hurt the merger. I mean, isn't he kind of involved in this? He signed the merger agreement, and the representation in the merger agreement is his. He also signs the Sorbanes-Oxley compliance representation. The Sorbanes-Oxley representation is a certification that the company has implemented internal controls sufficient to ensure that management becomes aware of material information on a reasonable basis. It's not an unconditional promise that internal controls exist that will detect any and all possible wrongdoing at any level of the corporation. You're almost saying it's meaningless. It's not meaningless, but in the context of this case, absent any facts that Dr. Magistri or Mr. Mulholland knew. So what plaintiffs have here is a representation attached to the 10-K that all laws have been combined. It was signed by Mr. Magistri? Yes. Sorry. I can't make sure I'm getting the name right. Also, he signs off the Sorbanes-Oxley saying we have internal controls so that my representation, when I signed that agreement, I felt this way, and, in fact, wasn't it determined, or at least in the consent decree, wasn't it determined that there were questions about the internal controls? Actually, the consent decree, the settlements raised questions about the company's training overseas for sales agents and distributors, Foreign Corrupt Practice Act controls. The Sorbanes-Oxley certifications, as they develop from the Private Securities Litigation Reform Act, really regard internal controls for disclosure and ensuring material information is disclosed timely. It seems to me. I'm sorry. Go ahead. It seems to me that you're somewhat, it's a legal term, mushing together the question of whether there's a misrepresentation with the question of scienter, and they really are two different things. It seems to me that my first set of questions was is there a misrepresentation? And I guess just speaking for myself, it seems to me that regardless of the fact that this is a long document and it's an attached document rather than freestanding does not preclude it from being a misrepresentation. It does not preclude it from being a misrepresentation. However, there have been no facts establishing that at the time that statement was made in the compliance representation in the merger agreement that anyone knew there were unlawful acts. It almost sounds like you're saying under the PSLRA you've got to prove your case in your pleading. You do. I'm not sure it goes quite as far as you seem to be suggesting. You do need to allege facts in the pleading raising an inference of actual knowledge or egregious recklessness. Here in the SEC settlement, the document that represents the SEC's allegations and presumably its best case against Envision and against later Mr. Piller, the SEC does not ever allege that Envision knew there were violations of the law or that Envision knew that there were bribes being paid. The complaint against Mr. Piller, in fact, only alleges negligence-based claims, a failure to implement adequate supervisory procedures overseas. The complaint against Envision doesn't identify any individual, much less Dr. Magistri, as having had knowledge of any bribes. Did Your Honor have a question? Yes. The counsel cited to us a recent case authored by Chief Judge Kaczynski in which Chief Judge Kaczynski wrote for the Court that because of the particular facts that are involved there, that it's absurd to suggest the board of directors would not discuss them. Now, the facts there are somewhat different. It had to do with stop workers, and the opinion points out that these orders, because of their devastating effect on the corporation's revenue, would have been discussed. Counsel argues the case here a little differently, that there's just a few of these little machines that are out there. Because of that, it's a very small organization. And those facts, as he sees them, brings them within the province of the Burson case to show specific facts giving rise to a strong inference of scienter. I'd like to hear your argument on that. Yes, Your Honor. Envision was, as alleged by Plaintiff, a $900 million public company selling explosive detection equipment in the two years after 9-11 worldwide. Mr. Piller was the head of sales, both domestic and international. And the record, the 10K that Plaintiff has put into the record, is replete with references to the vast number of contracts for which the company, Mr. Piller, with which they were involved, in which they were negotiating over the course of the time period throughout the world, including with the TSA in the United States, for Plaintiffs to raise an inference of scienter for a company of that size, with that number of contracts and with that kind of business, post-9-11, that Mr. Piller was aware of an illegal event having to do with a contract or an agreement or an offer by a sales agent, not an Envision employee in Thailand or in China or in the Philippines, does not raise a cogent and compelling inference of scienter, certainly not one that outweighs the more reasonable inference that the SEC reached, which was that Mr. Piller did not know of an illegal act and that the company did not know of an illegal act. Kennedy, to prove it, our cases are clear that there has to be specific facts giving rise to a strong inference of scienter. So that's all that has to be proven. What does the Second Amendment complaint and the proposed Third Amendment complaint dictate by way of specific facts to show a strong inference of scienter? Well, contrary to the Burson case and to some of the other cases that Plaintiff has cited, Lattice, for example, in America West, where there are facts alleged showing ---- I think this is an introductory clause to answering my question. Yes, it is. Yes, it is. Okay. Why don't you tell me what it ---- assume I know those cases and just tell me what's alleged. Yes, Your Honor. Yes, Your Honor, in the record at 585, there is allegations in the SEC complaint against Mr. Piller, which Plaintiff has copied into the ---- both the Second Amendment complaint and the Third Amendment complaint. And those allegations are that Mr. Piller received e-mails to which he did not agree to a suggestion by a sales agent that an offer of a gift might be made. It sounds like you're ---- I'm sorry. You let your voice drop. That an offer of a gift might be made. You know, you're telling us facts that are other than those that are pleaded, and our job is to look at the complaint. And if you look at pages 9 and following of the Second Amendment complaint, there is a laundry list of specific facts there that are alleged. Whether they can be proved is not our problem at this point. But taking all of those specifics together, as we're also required to do, why don't they yield a strong inference of the requisite state of mind? Under Taleb's and Gomper's, the Court's required to look at the totality of the complaint, the holistic picture that the Plaintiff paints. And here the Plaintiff has relied, he has copied right out of the SEC complaint, allegations about Mr. Piller, he's attached the SEC complaint, allegations about Mr. Piller, or as he calls it, a senior executive who received e-mails. The description of those e-mails does not raise an inference that Mr. Piller had knowledge that there was an illegal act undertaken by a sales agent or a sales rep. The allegations say Mr. Piller had received an e-mail alluding to a suggestion that a sales agent might pay a gift, not that a sales agent was going to commit a violation of the law. You're arguing a summary judgment and not the pleading issue. I mean, is it not enough to suggest or at least meet the pleading burden? And that's the issue before us. Well, the statement here in this case is a statement in the merger agreement that says in vision is in compliance with all laws. And so in order to demonstrate that that statement was materially false and misleading with scienter, one would have to show that the speaker, even if you assume it's Mr. Piller and it's not, that the speaker knew facts making that statement false at the time that the statement was made. And there are no such facts pled in this complaint. What is pled in reference to Mr. Magistri? With respect to Mr. Magistri and Mr. Mulholland, there is not a single fact alleged about their knowledge at the time of the merger agreement giving rise to an inference that they knew there was any unlawful activity. They are alleged to be corporate officers. Dr. Magistri is alleged to know the name of a distributor. And they are alleged to have received stock options as part of the merger. There's a lot more there. There's also, as Judge Wallace was pointing out earlier, an allegation concerning the nature of the business, the small number of clients that were in existence at that time worldwide, the nature of the communication among the parts of the company such that they were informed of each step of the way. There's a lot there that you're not, it seems to me, acknowledging as part of the pleading. I believe that the inference to be drawn from the type of business in which Envision was engaged is at odds with the allegation that Plaintiff is making, that these specific officers had day-to-day management or micromanagement of the nature that one sees in the America West complaint or in the applied complaint where the courts concluded that those officers, that as to those officers there were facts sufficient to raise an inference that they may know. Doesn't that bring a question to Burson? I believe that the Burson case is one in which there were very detailed allegations of day-to-day management, hands-on micromanagement, if you will, as to all of the underlying business, in particular knowledge of a stop order or a work stop order, as opposed to an e-mail between. Wasn't there a suggestion that everybody in the company because of its size, et cetera, had to know that this, how the back orders were handled and that the representations that they were actually work in progress might have been incorrect? And here, limited business, I mean, there was a lot of transactions, but and refresh my recollection, how long after the 10K and the disclosure of the merger did the announcement come out about the Foreign Corrupt Practices Act issue? The investigation, the fact that they were investigating the possible issue, was in June, which is three months after the merger announcement. The consent order, the settlements were the following. Three months, they discovered it and then issued this and said, okay, oops, we messed up, and they didn't know about it before is what you're saying. Isn't that enough to suggest something was going on? Actually, Your Honor, that's not the chronology. The merger agreement was disclosed in mid-March of 2004. In June of 2004, Envision announced that they were looking into possible problems in an overseas, in connection with overseas sales agents. And in December, the company announced that the investigation was resolved and the merger was going forward. I think the relative compact time between the announcement of the merger and the announcement of it, well, it looks like we might have a problem. We're investigating it. It is, and we believe that's further evidence that the officers of the company could not have possessed the enter to mislead anyone because General Electric is well known to have among the finest due diligence attorneys in the world, and certainly if the company believed that there would be an easily discovered FCPA violation, they would not have been so cavalier in a merger agreement, as Your Honors pointed out, in terms of the compliance representation. Thank you. Thank you, counsel. We have some rebuttal time remaining. Yes, Your Honors. I'll try to speak very quickly. I don't think I'm stepping out on a limb here that it's fair to infer that when somebody receives an e-mail that they actually read it and were aware of it, certainly under TELLABS it's at least as likely as receiving an e-mail and completely discarding it. And I would add to that that ultimately Mr. Piller entered into a consent decree with the SEC, which further suggests that he actually knew about it, even if the standard for that statute doesn't require actual knowledge. This is not a case of forward-looking statement projections, guesses about what was going to happen in the future. This is something, a fact which existed at the time of the merger agreement. InVision had bribed people overseas. That was a violation of the Foreign Corrupt Practices Act. That was something which there was an e-mail to Mr. Piller with a relatively limited number of sales. It's reasonable to infer certainly that Mr. Piller knew, and as a result the company has primary liability, and I think for all the reasons I said before in our brief, Mr. Magistri and Mr. Mulholland as well. Mr. Magistri in the merger agreement, he signs on behalf of the company, but the representations are those of the company. And the merger agreement, according to its own terms, was reviewed by the entire board of directors. I don't think that GE just sought a representation from Mr. Magistri, and that's not how it was portrayed to the investing public. Bribes are always material events, and company violating the law is material and is something that internal control is supposed to pick up. If you have any further questions, I'm here, Your Honors. You are? I don't think we have any more questions. Thank you for your time. I actually appreciate some very helpful arguments by both parties. The case is submitted and we stand adjourned.
judges: Wallace, Graber, Schiavelli